UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARCY MARIE GALVAN,<br><br>    Plaintiff,<br><br>    v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>    Defendant. | No. 1:23-CV-00169-DAD-SCR<br><br>ORDER DECLINING TO ADOPT FINDINGS AND RECOMMENDATIONS, GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT, AND REMANDING THIS CASE TO DEFENDANT COMMISSIONER<br><br>(Doc. Nos. 15, 17, 22) |

    Plaintiff Darcy Galvan, proceeding with counsel, brought this action seeking judicial review of the Commissioner of Social Security's final decision denying her application for disability insurance benefits and supplemental security income under the Social Security Act. (Doc. No. 1.) The matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302.

    On September 6, 2024, the assigned magistrate judge issued findings and recommendations recommending that plaintiff's motion for summary judgment in her favor (Doc. No. 15) be denied, that the defendant Commissioner's cross-motion for summary judgment (Doc. No. 17) be granted, and that defendant's decision denying plaintiff's application for benefits be

1

1   affirmed.  (Doc. No. 22 at 14–15.)  Specifically, the magistrate judge concluded that the

2   administrative law judge ("ALJ") provided specific, clear and convincing reasons for discounting

3   plaintiff's testimony, and that the ALJ did not commit reversible error in assessing the medical

4   opinions in the record.  (*Id.* at 6–14.)  Accordingly, the magistrate judge concluded that the ALJ

5   did not err in finding that plaintiff was not disabled prior to September 30, 2012.  (*Id.* at 15.)

6   Those findings and recommendations were served on the parties and contained notice that

7   any objections thereto were to be filed within fourteen (14) days after service.  (*Id.* at 15.)

8   Plaintiff timely filed her objections on September 13, 2024.  (Doc. No. 23.)  Defendant filed an

9   opposition thereto on September 20, 2024.  (Doc. No. 24.)

10  In accordance with the provisions of 28 U.S.C. § 636(b)(1)(B), this court has conducted a

11  *de novo* review of the case.  Having carefully reviewed the entire file, including plaintiff's

12  objections and the Commissioner's reply thereto, the court declines to adopt the pending findings

13  and recommendations.

14  In her objections, plaintiff argues that the ALJ failed to provide specific, clear and

15  convincing reasons to discount her subjective testimony.  (Doc. No. 23 at 4–7.)  Because the court

16  concludes that the ALJ did err in this regard, the court will not consider plaintiff's remaining

17  arguments, namely that the ALJ failed to properly evaluate the medical opinions of Dr. Jacklyn

18  Chander, psychiatric nurse practitioner Ebele Mbeledogu, and state agency psychiatrist Dr. J.

19  Collado.  (*See id.* at 7–11.)

20  The ALJ summarized plaintiff's subjective testimony as follows:

> The claimant testified that she has depressive episodes with hallucinations, excessive sleep, and insomnia and manic episodes where she gets extremely high and talks fast.  She said she has trouble concentrating and remembering, decreased appetite, paranoia, crying episodes, lack of motivation, and energy problems.  The claimant reported that at times she stays in bed most of the day and isolates. . . .  Due to her conditions and symptoms, the claimant stated that has a number of limitations, some of which involve concentrating, remembering, and getting along with others.  The claimant testified she had difficulty getting along with coworkers and supervisors when she worked.

27  (Doc. No. 11-1 at 26.)  Plaintiff also testified that when she worked full-time in the past, she

28  could "handle [the jobs] for a certain period of time," but that her stress would always build up

2

1  until she was hospitalized.  (*Id.* at 74.)  She testified that "[t]hat's generally how it's gone on for
2  the last 20 years or so."  (*Id.*)
3       An ALJ must employ a two-step test to "determine whether a claimant's testimony
4  regarding subjective pain or symptoms is credible."  *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th
5  Cir. 2014).

> First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged. . . .  If the claimant satisfies the first step of this analysis, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.  This is not an easy requirement to meet:  The clear and convincing standard is the most demanding required in Social Security cases.

11  *Id.* at 1014–15 (internal citations and quotation marks omitted); *see also Ferguson v. O'Malley*,
12  95 F.4th 1194, 1200 (9th Cir 2024) (same).
13       Here, at the first step, the ALJ found that plaintiff had the severe impairments of bipolar I
14  disorder and bereavement, and that these impairments could reasonably be expected to cause the
15  alleged symptoms described above.  (Doc. No. 11-1 at 26.)  At the second step, the ALJ found
16  that "the claimant's statements concerning the intensity, persistence and limiting effects of these
17  symptoms are not entirely consistent with the medical evidence and other evidence in the record
18  for the reasons explained in this decision."[1]  (*Id.*)  Specifically, the ALJ found that plaintiff's
19  /////

---

[1] The court notes that it appears the ALJ failed to specify which testimony she found not to be consistent with the medical evidence of record in this case.  Instead, the ALJ summarized both plaintiff's testimony and the medical evidence of record, and then provided the boilerplate statement that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  (Doc. No. 11-1 at 26.)  The Ninth Circuit has previously rejected such an approach.  *See Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir. 2015) ("[The ALJ] simply stated her non-credibility conclusion and then summarized the medical evidence supporting her RFC determination.  This is not the sort of explanation or the kind of 'specific reasons' we must have in order to review the ALJ's decision meaningfully, so that we may ensure that the claimant's testimony was not arbitrarily discredited.").  However, plaintiff did not raise this argument in her objections.  Moreover, the court will remand this action to the ALJ for further proceedings on other grounds.  Accordingly, the court will not consider in this order whether the ALJ ran afoul of the Ninth Circuit's decision in *Brown-Hunter*.

subjective testimony was not consistent with her activities of daily living, the objective medical evidence, and medical opinions in the record. (*Id.* at 26–32.)

**A.     Plaintiff's Activities of Daily Living**

The ALJ found plaintiff's subjective testimony to be inconsistent with her ability to "navigate public transportation, drive a car, dress and groom herself, shop in stores, maintain a friendship, and do simple household chores such as washing dishes, doing laundry, and preparing meals." (*Id.* at 26.) In her objections, plaintiff argues that the ALJ omitted a key phrase from the document in the record listing these activities (*see* Doc. No. 23 at 6); the report of Jacklyn Chandler, Ph.D. states that plaintiff can do these activities "with restriction related to bipolar" (Doc. No. 11-1 at 496). Plaintiff argues that the ALJ failed to consider plaintiff's activities in light of plaintiff's bipolar disorder given the fact that plaintiff's symptoms "remit at times allowing her to perform greater mental activities, but then worsen at other times." (Doc. No. 23 at 7.) The defendant Commissioner did not address plaintiff's argument in this regard in either his cross-motion for summary judgment or his response to plaintiff's objections to the pending findings and recommendations.

The court concludes that the ALJ erred in finding plaintiff's activities of daily living to be inconsistent with her subjective testimony. "[W]hile an ALJ may consider a claimant's daily activities, 'claimants should not be penalized for attempting to lead normal lives in the face of their limitations.'" *Smith v. Saul*, 820 F. App'x 582, 585 (9th Cir. 2020) (quoting *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998)) (reversing the district court's order affirming the denial of benefits and remanding for the award of benefits where "the ALJ erred in discounting Smith's testimony regarding her bipolar disorder").[2] The Ninth Circuit has "long recognized that 'many home activities are not easily transferable to what may be the more grueling environment of the workplace,'—particularly for claimants suffering from mental illness, who may be able to 'limit[ ] environmental stressors,' and thus experience 'improved functioning,' at home in a way that is impracticable at work." *Id.* (quoting *Garrison*, 759 F.3d at 1017) (alterations in original).

---

[2] Citation to this unpublished Ninth Circuit opinion and to others cited in this order is appropriate pursuant to Ninth Circuit Rule 36-3(b).

4

Here, "the ALJ did not explain how plaintiff's daily activities translated to a competitive work environment." *Christopher R. v. O'Malley*, No. 23-cv-00873-RBM-LR, 2024 WL 3596858, at *13 (S.D. Cal. July 30, 2024), *report and recommendation adopted by* 2024 WL 4184084 (S.D. Cal. Aug. 8, 2024). Indeed, the Ninth Circuit has found that activities similar to those engaged in by plaintiff here did not support an ALJ's decision to discount the subjective testimony of a claimant diagnosed with bipolar disorder:

> The sorts of daily activities Diedrich could perform are also not readily 'transferable to a work environment.' House chores, cooking simple meals, self-grooming . . . as well as occasional shopping outside the home, are not similar to typical work responsibilities. We note that even though Diedrich was performing these tasks, she was likely not doing them with the consistency and persistence that a work environment requires. Diedrich's symptoms also included anxiety related to social interactions, making a task easy to perform inside the home potentially very difficult to perform outside the home.

*Diedrich v. Berryhill*, 874 F.3d 634, 643 (9th Cir. 2017); *see also id.* (noting that the fact "[t]hat Diedrich could participate in some daily activities does not contradict the evidence of otherwise severe problems that she encountered in her daily life" such as "going three to five days without sleeping; weeks-long bouts of depression . . . inability to follow through on activities . . . anxiety about, and aversion to, social situations . . . [and] trouble handling stress"). The court's conclusion in this regard is strengthened by the episodic nature of plaintiff's impairments, such that at times she may be able to carry out her activities of daily living and at times she may not. *See Christopher R.*, 2024 WL 3596858, at *13 ("Because plaintiff was not performing his daily activities with the consistency and persistence required by a typical work environment, such activities do not meet the threshold for transferable work skills."); *see also id.* at *12 ("Plaintiff's daily activities, which included preparing simple meals . . ., taking public transportation, walking, driving, shopping at local discount stores for food, and occasionally performing yardwork, are almost identical to the activities that the Ninth Circuit found insufficient to discount a claimant's subjective symptom testimony.").

Accordingly, plaintiff's "ability to perform certain daily activities is not a clear and convincing reason to find her less than fully credible." *Diedrich*, 874 F.3d at 643; *see also*

*Ferguson*, 95 F.4th at 1203 ("Ferguson testified that he experiences headaches two or three times a week, and that sometimes, the headache lasts 'a day or two.' Further, Ferguson testified that when he experiences headaches, he does not 'get out of [his] room,' and he does 'nothing.' Ferguson can both do nothing when he has severe headaches and engage in his daily activities when does not.") (alterations in original).

**B.     Objective Medical Evidence and Sustained Improvement with Medication**

The findings and recommendations concluded that the ALJ appropriately discounted plaintiff's subjective testimony in light of medical evidence inconsistent with her alleged symptoms. (Doc. No. 22 at 7–8.) Specifically, those findings and recommendations highlighted "mental status examinations [that] frequently revealed objective findings that were within normal limits" regarding concentration and memory, as well as records from 2019 through 2021 indicating that plaintiff was "doing well" with the aid of medication. (*Id.*)[3]

Plaintiff argues that the mental status examinations and the medical records from 2019 through 2021 constitute "cherry-picked" evidence that fail to represent the waxing and waning nature of her symptoms. (Doc. No. 23 at 4–5.) The defendant Commissioner argues in response that the findings and recommendations adequately considered the waxing and waning nature of plaintiff's symptoms.

/////

---

[3] The court notes that the mental status examinations finding plaintiff to be within normal limits may not be inconsistent with plaintiff's subjective testimony regarding how her depression prevents her from working. *See, e.g.*, *Winter v. Berryhill*, 711 F. App'x 847, 850 (9th Cir. 2017) ("First, that Winter's alleged symptoms were not supported by other medical evidence in the record, such as the above-discussed mental status exams, is not a convincing reason because the contents of the mental status exams (and other parts of the record) do not contradict Winter's reported level of impairment. Records . . . all support that Winter suffered debilitating symptoms from bipolar disorder. . . . That Winter was 'friendly and cooperative' . . . does not make the medical records inconsistent with Winter's claimed level of disability, because a 'friendly and cooperative' individual who is not 'angry' could very well suffer from the limitations reported by Winter."); *C.D. v. Kijakazi*, No. 22-cv-05574-VKD, 2024 WL 40210, at *10 (N.D. Cal. Jan. 3, 2024) ("The ALJ also described C.D.'s normal performance on mental status exams as weighing against the credibility of his reported symptoms. However, the results of C.D.'s mental status exams have little relevance to most of C.D.'s symptoms of PTSD and depression."). However, plaintiff did not raise this argument in her objections. Because the court will remand this case to the ALJ on other grounds as discussed below, the court need not address this issue further.

In her opinion, the ALJ summarized the medical evidence of record as follows.  First, the ALJ noted plaintiff's overdose on medications in 1999, her psychiatric hospitalization in 2010, her manic episode in approximately April 2012, and her reports of experiencing symptoms in April 2019.  (Doc. No. 11-1 at 26.)  However, the ALJ contrasted that evidence with a report from October 2012 in which plaintiff reported that she was "doing fine" and not experiencing symptoms, as well as treatment notes from 2019 and 2020 stating that plaintiff's medication was effective in controlling her symptoms and that plaintiff did not display any symptoms at that time.  (*Id.* at 27.)  The ALJ then discussed plaintiff's psychiatric hospitalization in July 2020, after which her medications were adjusted.  (*Id.* at 27–28.)  Next, the ALJ discussed plaintiff's psychiatric hospitalization a month later in August 2020, after which plaintiff's medications were again adjusted, her symptoms ebbed, and she "was stable."  (*Id.* at 28.)  The ALJ then addressed how plaintiff had ceased taking some of her medications and experienced another psychiatric hospitalization in January 2021 and attempted suicide in February 2021.  (*Id.*)  However, the ALJ noted that plaintiff repeatedly reported not experiencing symptoms and "feeling good" from March 2021 through June 2021.  (*Id.* at 29.)  Ultimately, the ALJ agreed with medical expert Dr. Peterson that while plaintiff was suffering from bereavement and "was hospitalized during a difficult time," plaintiff "was currently described as stable and doing well."  (*Id.* at 30.)  The pending findings and recommendations concluded that the ALJ duly considered the evidence in the record as a whole, including plaintiff's psychiatric hospitalizations as well as the "numerous reports spanning several years which indicated plaintiff's symptoms were well controlled with medication," and that the ALJ reasonably concluded that the broader context reflect symptom improvement with medication.  (Doc. No. 22 at 9.)

The undersigned notes, however, that the ALJ failed to consider in her opinion any evidence from the period between October 2012 and April 2019, a gap of over six-and-a-half years.  The ALJ was tasked with determining whether plaintiff had been disabled from the date of March 1, 2012 through the date of decision, February 2, 2022, a span of decade—yet the ALJ focused almost exclusively on records pertaining only to a three-year period of time.  Moreover, the content of the records from those missing years was highly relevant.  In the ALJ's opinion,

plaintiff is portrayed as having been stable, with her symptoms under control from 2012 until her mother was diagnosed with terminal liver cancer in 2020, at which point plaintiff rapidly but briefly deteriorated. Plaintiff was placed on involuntary psychiatric holds pursuant to California Welfare and Institutions Code § 5150 three times in six months, then tried to kill herself. However, the ALJ found that in the months following her suicide attempt, plaintiff's symptoms were controlled with medication and she "was currently described as stable and doing well." (Doc. No. 11-1 at 30.)

Considering medical evidence from the nearly seven missing years shows, in the undersigned's view, a completely different picture. As the ALJ discussed, plaintiff overdosed on medication in 1999, began treatment for bipolar disorder in 2008, had a psychiatric hospitalization in 2010, and experienced her most recent manic episode in April 2012.[4] (*Id.* at 26.) Then, records from April 2013 not discussed by the ALJ reflect that plaintiff reported reduced but present symptoms of "anger, sadness, poor sleep, [and] mania" multiple times per week. (*Id.* at 486.) However, by June 2013, plaintiff reported "doing fine and [being] compliant with medication." (*Id.* at 448.) Sixteen months later, in October 2014, she reported worsening symptoms while "going thru a lot of stress," and then stabilized four months later. (*Id.* at 438, 436, 434.)[5] The medical evidence of record reflects plaintiff's symptoms to be controlled for approximately two years until November 2016, at which time her partner died unexpectedly. (*Id.* at 418.) Plaintiff then reported being "overwhelmed with sadness" for several months. (*Id.* at 418, 416.) By March 2017, she was still "overwhelmed with sadness," at which time her medication was changed, but she appeared to be stable. (*Id.* at 414.) Plaintiff remained stable for approximately 21 months while experiencing occasional depressive symptoms. (*Id.* at 409, 407, 406.) However, she again became "overwhelmed and depressed" in December 2018, reporting sleeping problems and suicidal ideation. (*Id.* at 403.) Her medications were increased at that time, after which plaintiff returned to stability. (*Id.* at 403, 401.) As the ALJ discussed, plaintiff

---

[4] The court notes that the timing of this manic episode appears to coincide with when plaintiff quit her last job due to "difficulty getting along with people at work." (Doc. No. 14-1 at 11.)

[5] The record before the court is organized in reverse chronological order.

then remained stable for approximately 18 months before being hospitalized again in July 2020, August 2020, and January 2021, with a suicide attempt in February 2021.  Plaintiff reported continuing to struggle with depression in March and April of 2021, then reported little to no symptoms in May and June.  (*Id.* at 843–909.)

Viewing the record as a whole, the ALJ failed to provide clear and convincing reasons for discounting plaintiff's subjective testimony when she characterized plaintiff's most recent psychiatric hospitalizations as aberrations related to the death of her mother.  As the Ninth Circuit has recognized,

> [I]t is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment.  Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working.

*Garrison*, 759 F.3d at 1017; *see also Smith v. Kijakazi*, 14 F.4th 1108, 1112 (9th Cir. 2021).  By ignoring medical records from almost 70% of the relevant time period, the ALJ found that plaintiff had been stable for eight years, struggled significantly for one year, and was now once again stable and improving with medication.  When the full medical evidence of record is accounted for, it appears plaintiff was hospitalized in 2010, had manic episodes in January through March of 2012, then experienced reduced symptoms for one year, was stable for approximately a year and a half, had worsening symptoms for one to four months, controlled her symptoms with medication for two years, became deeply depressed for four months, stabilized for approximately six months after a change in medication but continued to feel "overwhelmed with sadness" at times, experienced worsening symptoms for three months, experienced no significant symptoms for nine months, became suicidal for one month at which time her medication was changed again, was stable for eighteen months, and then was hospitalized three times and tried to kill herself over the span of approximately six months, during which time her medication was adjusted twice.  She then reported reduced or no symptoms for four months, through June 2021.

When assessing a claimant's subjective testimony, "treatment records must be viewed in light of the overall diagnostic record." *Ghanim v. Colvin*, 763 F.3d 1154, 1164 (9th Cir. 2014);

*see also id.* ("When read as a whole, the treatment notes do not undermine Ghanim's testimony. Rather, they consistently reveal that, despite some occasional signs of improvement, Ghanim continued to suffer frequent nightmares, hallucinations, social anxiety, difficulty sleeping, and feelings of hopelessness."); *Fleenor v. Berryhill*, 752 Fed. App'x 451, 453 (9th Cir. 2018). Moreover, "[i]t is the nature of bipolar disorder that symptoms wax and wane over time." *Attmore v. Colvin*, 827 F.3d 872, 878 (9th Cir. 2016); *see also Winter*, 711 F. App'x at 850–51 (reversing the district court's order affirming the denial of benefits and finding the ALJ erred in discounting the subjective testimony of a claimant with bipolar disorder where the medical records did not show "sustained" improvement in the claimant's symptoms).[6] Here, by failing to consider almost seven years of medical evidence while determining plaintiff's disability over a ten-year period, the ALJ failed to consider the waxing and waning of plaintiff's symptoms in light of the overall diagnostic record. The "cherry-picked" medical evidence of record and plaintiff's purported at-times improved symptoms do not provide specific, clear and convincing reasons to discount plaintiff's subjective testimony. *See, e.g.*, *C.D. v. Kijakazi*, 2024 WL 40210, at *10 (finding that the ALJ failed to provide specific, clear and convincing reasons to discount the claimant's subjective testimony where "the ALJ failed to consider how the improvements referenced in C.D.'s medical records fit into the 'overall diagnostic record'" and where "it [was] not clear from the record that C.D's improvements were sustained and significant, such that he could engage in gainful employment"); *cf. Smith v. Kijakazi*, 14 F.4th 1108, 1112 (9th Cir. 2021) ("The ALJ discredited Smith's testimony as a whole, but her decision does not sufficiently consider the duration of, or chronological fluctuation in, Smith's symptoms.").

**C.     The ALJ's Remaining Reasons**

Having concluded that the justifications identified in the findings and recommendations do not provide specific, clear and convincing reasons upon which to discount plaintiff's subjective testimony, the undersigned considers whether the ALJ provided any other specific,

---

[6] The court notes it is not clear that the ALJ found sustained improvement here. The ALJ made no such express finding, and some findings suggest merely temporary improvement. (*See, e.g.*, Doc. No. 11-1 at 30) ("[Dr. Peterson] stated that the claimant . . . was currently described as stable and doing well.").

clear and convincing reasons to discount plaintiff's testimony at the administrative hearings. The court concludes the ALJ did not do so.

The only other reason provided by the ALJ in this regard was that plaintiff's testimony was not consistent with the medical opinions in this case as credited by the ALJ. The ALJ relied heavily on the opinion of the medical expert, Dr. Peterson, which the ALJ purported to find fully persuasive, and to a lesser extent on the opinions of agency psychological consultants Dr. Collado and Dr. Murillo, which the ALJ found partially persuasive. (Doc. No. 11-1 at 29–31.) Dr. Peterson opined that plaintiff's symptoms were controlled with medication and that plaintiff had moderate, mild, or no limitations in interacting with others. (*Id.* at 30.) Dr. Collado found plaintiff could sustain "limited" contact with others, while Dr. Murillo found plaintiff could "interact appropriately" with others. (*Id.* at 31.)

The court concludes that the ALJ's reliance on these medical opinions is not a specific, clear and convincing reason to discount plaintiff's testimony in light of the seven years of omitted medical records discussed above which were not addressed. The court notes that the ALJ relied most heavily on Dr. Peterson's opinion because it was "supported by testimony and notes after a thorough review of the claimant's longitudinal medical history and the opinion is consistent with the evidence including mental status examinations." (*Id.* at 30.) However, the court cannot find that Dr. Peterson's opinion being consistent with the ALJ's view of the record is sufficient to provide a clear and convincing reason in this regard. This is especially true in light of the ALJ's incomplete view of that record. Indeed, the only medical evidence cited by the ALJ in support of this assertion was again medical records from 2020 and 2021. (*Id.*) Moreover, the court has reviewed Dr. Peterson's interrogatory submitted in October 2020, in which Dr. Peterson relied almost exclusively on medical evidence from 2019 through 2021. (*Id.* at 832–38.) Similarly, because the ALJ appeared to rely heavily on the opinion of Dr. Peterson in evaluating the opinions of Dr. Collado and Dr. Murillo,[7] those opinions also fail to provide clear and convincing evidence.

---

[7] The ALJ's reasons for partially crediting the opinions of Dr. Collado and Dr. Murillo are not entirely clear. (*See* Doc. No. 11-1 at 31.)

11

**D.     Whether the ALJ's Error was Harmless**

Ultimately, the court finds that the error in failing to consider nearly seven years of evidence colored the ALJ's appraisal of the objective medical evidence, the opinions of the medical experts, and plaintiff's subjective testimony. The undersigned cannot find this error to be harmless under these circumstances. *See Truman v. Saul*, No. 2:18-cv-02129-KJD-NJK, 2019 WL 7584734, at *4–5 (D. Nev. Nov. 27, 2019) ("[T]he ALJ erred in finding without substantial evidence that plaintiff's mental status findings were consistently normal and further erred by not conducting a holistic analysis to determine if plaintiff's testimony is inconsistent with the medical record when viewed in the context of the overall diagnostic picture. . . . [T]he error identified above is a foundational one that may have impacted the ALJ's ultimate conclusion. The same error may impact other aspects of the ALJ's decision to discount plaintiff's testimony, such as her daily activities. As such, the undersigned cannot say with confidence that any error on this issue was a harmless one."), *report and recommendation adopted by* 2020 WL 225156 (D. Nev. Jan. 14, 2020).

Plaintiff requests that this action be remanded to the ALJ for further administrative proceedings. (Doc. No. 23 at 7.) In his cross-motion for summary judgment, the Commissioner agreed that if the court were to find that the ALJ failed to provide clear and convincing reasons in support of her credibility finding, then "the 'ordinary remand rule' applies and the only appropriate remedy would be to remand for additional administrative proceedings and a new decision." (Doc. No. 17 at 21.) The court agrees with the parties in this regard, particularly in light of the degree to which plaintiff's symptoms have fluctuated over time. Accordingly, the matter will be remanded to the ALJ for further proceedings on an open record. *See, e.g.*, *Truman*, 2019 WL 7584734, at *6 ("This is not one of those 'rare' cases in which the undersigned finds

/////
/////
/////
/////
/////

[an award of benefits] to be appropriate because there is no useful purpose in remanding. Instead, the better course is to remand to the ALJ to conduct a holistic review of the record.").[8]

## CONCLUSION

For the reasons explained above:

1. The court declines to adopt the findings and recommendations issued on September 6, 2024 (Doc. No. 22);

2. Plaintiff's cross-motion for summary judgment (Doc. No. 15) is granted;

3. Defendant's cross-motion for summary judgment (Doc. No. 17) is denied;

4. This case is remanded to the Commissioner for further proceedings on plaintiff's claims for disability insurance benefits and supplemental security income consistent with this order; and

---

[8] Plaintiff also argues that the ALJ failed to properly consider several medical opinions, primarily on the grounds that the ALJ discredited these opinions largely because they conflicted with the opinion of Dr. Peterson. (*See* Doc. No. 23 at 7–11.) The court is skeptical that the ALJ properly considered the medical opinions in this case for many reasons, most notably due to the failure to consider records pertaining to the majority of the relevant time period as discussed above. The court further notes that Dr. Peterson testified at the administrative hearing in May 2020 that plaintiff's symptoms were controlled with medication. (Doc. No. 11-1 at 29; *see also id.* at 75–86.) However, thereafter, plaintiff was hospitalized two times over the next three months. Two months later, in October 2020, Dr. Peterson supplied an interrogatory, again finding that plaintiff had only mild or moderate limitations. (*Id.* at 30.) However, plaintiff was hospitalized three months later and attempted suicide one month after that. Six months later, at the administrative hearing in August 2021, Dr. Peterson once again opined that plaintiff was stable and that her limitations were then only mild or non-existent. (*Id.*) The ALJ found that Dr. Peterson had opined in October 2020 that plaintiff was capable of occasional public contact and frequent coworker and supervisor contact, and that in August 2021 plaintiff had improved to a non-severe condition with no recommended limitations. (*Id.*; *see also* Doc. No. 14-1 at 25–26.) Yet, despite purporting to find Dr. Peterson's opinion persuasive, the ALJ found that plaintiff's condition *was* severe and that she did have the limitations suggested by Dr. Peterson in October 2020, rather than the lack of limitations suggested by Dr. Peterson in August 2021. (Doc. No. 23 at 25, 30.) The ALJ did not explain this reliance on Dr. Peterson's opinion regarding plaintiff's condition in October 2020, rather than his opinion regarding her condition in August 2021. Notably, the ALJ then relied on the opinion of Dr. Peterson—a non-treating, non-examining physician who repeatedly testified that plaintiff's symptoms were under control immediately prior to her psychiatric hospitalizations—to discount the opinions of plaintiff's treating and examining personnel which supported greater limitations. (*See* Doc. No. 11-1 at 30–31.) Nonetheless, because the court will remand this matter for further proceedings, and because consideration of plaintiff's remaining arguments would not change the outcome of the pending cross-motions for summary judgment, the court need not address plaintiff's remaining arguments further.

13

5. The Clerk of the Court is directed to enter judgment in favor of plaintiff and close this case.

IT IS SO ORDERED.

Dated:   **September 30, 2024**

DALE A. DROZD
UNITED STATES DISTRICT JUDGE